Ray AYDT, Joseph De Frier, Dorothy Kantarski, Clifford Lloyd and Howard Yount, Plaintiffs,

v.

DE ANZA SANTA CRUZ MOBILE ESTATES, a California limited partnership, Defendant.

No. 86 C 10040.

United States District Court, N.D. Illinois, E.D.

April 12, 1991.

Mark J. Muscarello, Jeffrey Lawrence, Muscarello, Crisanti & Young, Elgin, Ill., for plaintiffs.

Timothy F. Haley, Catherine E. Carpenter, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

LEINENWEBER, District Judge.

Plaintiffs, residents of an Elgin mobile home park, filed a seven-count complaint seeking declaratory, injunctive relief, and damages on their own behalf and on behalf of approximately 1100 other park residents against defendant, De Anza Santa Cruz Mobile Estates ("De Anza"). On April 25, 1988, the court certified a class and three sub-classes of tenants depending on the form and dates of the leases they had signed. On February 24, 1989, the court granted plaintiffs' summary judgment motion on Counts III, IV, V, VI and VII of the amended complaint. *Aydt v. De Anza Santa Cruz Mobile Estates*, 708 F.Supp. 192 (N.D.Ill.1989).[1]

Summary judgment was based on the court's interpretation of the Illinois Mobile Home Landlord and Tenant Rights Act (the "Act"), Ill.Rev.Stat., ch. 80, § 201 *et seq.*, which became effective on January 1, 1980. The Act was intended to protect mobile home park tenants in three relevant ways. First, the operator of the park must offer the tenant a written lease (Section 6); second, each lease was to be automatically renewable at its expiration unless terminated for reasons of tenant misconduct (Sec-

---

1. The parties had previously entered into a stipulation to dismiss Counts I and II.

tion 8); and third, the operator could not increase fees and rents unless the written lease clearly set forth the terms for payment of rent (Section 9). Because De Anza sought unilaterally to terminate leases entered into in 1981, and to impose new leases containing rental increases not provided for in the 1981 leases, the court found it in violation of the Act.

This decision set off a burst of legislative activity that resulted in the enactment of an amendment to Section 9 of the Act, effective on January 1, 1990. This amendment provided that "[r]ents charged to a tenant by a park owner may be increased upon renewal of a lease. Notification of an increase shall be delivered 60 days prior to expiration of the lease." Public Act 86–851 ("PA 86–861"). Based on this amendment and the floor debate (*see Senate Transcript*, 86th General Assembly, Reg.Sess., June 26, 1989), De Anza sought reconsideration contending that PA 86–851 should be applied retroactively. The court denied this motion holding that Section 9 of the Act was not ambiguous prior to the amendment and therefore the amendment could not be fairly called a clarification. *Aydt v. De Anza Santa Cruz Mobile Estates*, slip op., p. 7, 1990 WL 19903 (Feb. 20, 1990). Plaintiffs have now filed a motion and a supplemental motion for entry of a judgment based on their interpretation of the court's previous opinions. The proposed judgment covers a number of areas, the most important of which seeks to enjoin De Anza from imposing further rental increases on the plaintiff classes based on a market factor. De Anza has filed specific objections, the most important of which contends that PA 86–851 now permits De Anza to impose market rate rental increases upon renewal of plaintiffs' existing leases.

## Public Act 86–851

■ Plaintiffs say that in spite of the amendment to Section 9, De Anza cannot unilaterally increase rents now because to do so would defeat the Act's remedial purpose and would be inconsistent with the language in the first paragraph of Section 9 requiring the rental terms be "clearly set forth" in the lease. The easy answer is that the clear intention of the legislature in amending Section 9 was to allow park operators to do precisely what plaintiffs claim would defeat the purpose of the Act, i.e., to have the uninhibited right to condition lease renewals on the acceptance of rental increases. While this reduces the Act's protection to tenants by giving park owners considerably more economic power over their operations, it involves a question of policy that properly lies with the legislature. Despite what this court considered clear language to the contrary, the legislative debate indicates that the sponsor of the Act never intended to afford this protection to park tenants, and it was the sole purpose of the sponsor of the amendment to restore power to the park owners. *Senate Transcript*, June 26, 1989.

■ Plaintiffs next argue that even assuming the right to impose a rent increase exists as a result of PA 86–851, nevertheless, De Anza has waived its right to do so by failing to notify the tenants properly as required by the amendment, and the amendment's effective date (Jan. 1, 1990) was too late to help De Anza with respect to lease terminations occurring on December 31, 1989.

The evidence shows that the leases in question all expired on December 31, 1989, and new proposed leases commenced on January 1, 1990. On October 25, 1989, more than 60 days prior to the lease expirations (and prior to the effective date of the amendment), De Anza sent letters to plaintiffs notifying them that their leases were set to expire on December 31, 1989, and that De Anza had "decided to terminate" the leases. Plaintiffs were invited to enter into new leases that reflected a new "higher" rental. On November 7, 1989, De Anza sent plaintiffs another letter stating that it was not De Anza's intention to terminate the leases but only to adopt "a new form of lease" subject to the new higher rents specified in the October 25 letter. Plaintiffs contend that this second letter vitiated the first and was untimely. De Anza answers that, taken together, the two letters clearly placed plaintiffs on notice that if they wished to stay they could do so only at a

higher rent and this satisfied the purpose of the notice requirement by the amendment.

Section 9, as amended, permits rental increases upon renewal of a lease so long as the tenant is notified of the proposed increase 60 days prior to the expiration of the lease. Section 8 prohibits a landlord from terminating a lease without specifying, in writing, the reason, which this court has held can only be tenant misconduct. Thus if the letter of October 27 was a notice to terminate, it was ineffective. However, this letter also included a notice of De Anza's willingness to enter into a new lease with each tenant. This, under Illinois law, is considered to be an offer of "renewal". *Sanni, Inc. v. Fiocchi*, 111 Ill.App.3d 234, 66 Ill.Dec. 945, 951, 443 N.E.2d 1108 (2nd Dist.1982) ("Renewal is a 'demise' for [a] period with a privilege for a new lease for [an] extended term"). In other words, a tenant is in possession of the premises for a specific term pursuant to a written lease. At the end of the term, the written lease for that specific term ceases and is replaced by a written lease for a new term, i.e., the right to possession is "renewed". Looked at in this way, the letters of October 25 and November 7 say basically the same thing: the tenant has the right to remain on the premises for an additional period of time under a new lease agreement at a higher rent.

The fact that the notice was served prior to the effective date of the amendment would not effect the validity of the notice. The amendment was signed into law by the governor on September 7, 1989. It was a valid law as of that date even though its provisions were not effective until January 1, 1989. *See* Ill.Rev.Stat., ch. 1, § 1201. By its clear language the amendment specifies that a park owner may raise rents if he has performed the condition precedent of sending a 60–day notice to his tenant of his intention to do so. Because his right to raise rent did not accrue until January 1, 1990, he could not raise rent until the later of the date the lease is renewed or January 1, 1990.

The final argument presented by plaintiffs, first raised in their reply brief, is that applying PA 86–851 to plaintiffs would unconstitutionally impair their lease agreements contrary to the impairment of contract clauses of Article I, Section 10 of the Constitution of the United States, and Article I, Section 16 of the Illinois Constitution of 1970. The thrust of this argument is plaintiffs' contention that De Anza allowed the leases expiring on December 31, 1989 to renew automatically. Thus, applying the amendment to allow a rent increase would be to use the amendment to impair the plaintiffs' contract right to have the rental continue under the automatically renewed old lease. However, this argument begs the question. If De Anza allowed the leases to renew automatically at the previous rental, it then would not be entitled to impose an increase under the amendment to Section 9. If De Anza did not allow the leases to renew automatically, then it was free to impose an increase under the amendment to Section 9 if it notified plaintiffs properly. The relevant provision of plaintiffs' leases read as follows:

> Upon the expiration of the original term of this lease, it shall automatically be extended for successive one year periods unless resident or De Anza notifies the other in writing not less than thirty days prior to the expiration of the original or any succeeding term that the lease will not be automatically renewed.

The obvious meaning of De Anza's two letters was that it did not intend to renew the leases automatically. Both of the letters were sent more than 30 days prior to the expiration of the term of the lease, which was on December 31, 1989. Accordingly, the leases were not automatically extended for another year so as to prevent De Anza from imposing a rent increase.

Plaintiffs in a sur-surreply extend this argument further. The tenants entered into leases in 1981 which provided lease renewal at rates determined by the Consumer Price Index ("CPI"). Section 8 of the Act requires that each lease contain an option which automatically renews the lease except at the tenant's option or at the owner's option for tenant misconduct. Sec-

tion 9 required an owner to set forth clearly in the lease the rental terms, and prohibited him from changing the rental terms except as provided in the Act. Since the leases limited rental increases to the CPI, Ray Aydt argues that so long as he and the other plaintiffs obey the rules and avoid misconduct their leases will automatically renew, and De Anza can impose no rental increase above the CPI because to do so would be to allow PA 86–851 to impair their contract rights.

This argument confuses contractual rights and statutory rights. Section 8 mandates that a specific provision be included in the lease agreement, i.e., the right to lease renewal absent tenant misconduct. Section 8 does not mandate a specific rental provision; in fact, it requires no provision other than one allowing lease renewal. On the other hand, Section 9 before the amendment mandated that the terms for payment of rent be set forth in the lease and that the landlord could not change the rent "except as provided" in the Act. Prior to the amendment the only provision in Section 9 allowing rent increases was limited to provisions contained in the lease itself. Now, the Act provides its own mechanism for rent increases by allowing a park owner to increase rent at the time he renews the lease if he gives his tenants a 60–day notice.

There is no vested right in the continued existence of a public law which is not in the nature of a private grant or contract. *I.L.P.* "Constitutional Law", § 213. This rule applies no matter how beneficial the statute may have been to a particular person or class of persons and no matter how injurious the repeal or amendment of the statute might be to such person or persons. *Id.* Here, the amendment eliminated the statutory right to have future rental increases spelled out in the lease which must by its terms be renewable. The legislature deleted this statutory protection, and did not invalidate a contractual provision.[2] The cases cited by plaintiffs are not on point. Those cases involved state regulatory activities that had the effect of invali-

dating existing contracts between the parties. This is not the case here.

Therefore the court agrees that De Anza was free to raise the rents on all leases which were renewed on January 1, 1990.

### Mistake of Law

De Anza next argues that even if its imposition of increased rents prior to January 1, 1990 violated the Act, plaintiffs are foreclosed from recovering overpayments because of the mistake of law doctrine. This doctrine, which is viable in Illinois (*see*, e.g., *Jursich v. Arlington Heights Fed. Savings & Loan Assn.*, 110 Ill.App.3d 847, 65 Ill.Dec. 549, 553, 441 N.E.2d 864 (2nd Dist.1982)), holds that if an agreement expresses the thoughts and intentions of the parties at the time it was entered, no relief, affirmative or defensive, will be granted upon the assumption that the parties' thoughts and intentions would have been different had they been correctly advised of the law. *Holbrook v. Tomlinson*, 304 Ill. 579, 136 N.E. 745 (1922).

Here, however, the alleged mistake of law was entering into a contract that contained a provision contrary to the public policy of this state. The mistake of law doctrine does not apply because courts will not enforce what the legislature has declared illegal. *I.L.P.* "Contracts", § 162. The intent of the parties to such a contract is irrelevant and cannot make an illegal provision legal or binding. *Schnackenberg v. Towle*, 4 Ill.2d 561, 123 N.E.2d 817 (1955), *cert. denied*, 349 U.S. 939, 75 S.Ct. 785, 99 L.Ed. 1267. Where the parties are equally implicated, a court will not relieve either from the consequences of the illegal provision, but where public policy is advanced by allowing one of the parties to sue for relief, relief will be extended. Such instances include transactions in violation of such legislative acts as usury statutes, blue sky laws, rent control ordinances, and anti-gambling statutes. The type of relief available in instances where a party is attempting to recover overpayments made in violation of a statute is normally restitution. 6A *Corbin on Contracts*, § 1540.

---

**2.** One must also remember that the actual contract between the parties said nothing that would prevent De Anza from increasing rent at

its termination. Therefore, the right not to get a rent increase was statutory and not contractual.

Therefore, the mistake of law doctrine does not prevent plaintiffs from recovering rental overpayments.

### Computation of Rent Overcharges

■ The parties disagree over the base upon which plaintiffs' claimed damages are to be computed. The leases provided that De Anza was entitled to an annual rent increase based on the CPI. In some years De Anza did not increase rent to the maximum authorized. Plaintiffs contend that De Anza waived its right to the higher rent and thus they are entitled to damages based upon the difference between what they actually paid and what they should have paid, rather than what De Anza could have charged and what they should have paid in the years in which they were overcharged. De Anza contends that the damages ought be based on the difference between what plaintiffs actually paid and what De Anza could have charged during the years it charged the illegal so-called market rate rentals.

Restitution damages are designed by their nature to be equitable so as to prevent one party from being unjustly enriched at the expense of the other. Accordingly, neither party is entitled to a windfall. Had De Anza charged plaintiffs the highest rent it was allowed under the leases, each succeeding year would be higher because each increase is based on the CPI times the previous year's rent. Under the statute, plaintiffs were entitled to be informed of the hypothetical maximum rent to which they were subject in future years, not what they would actually have to pay if it was less. De Anza's violation of the Act was charging rents in excess of that hypothetical figure. The Act does not compel and It would not be fair or equitable to require De Anza to pay higher restitutionary damages because it did not charge plaintiffs the maximum rent that it was legally allowed to charge. Accordingly, plaintiffs' damages are to be computed by deducting the rentals paid by plaintiffs minus the maximum hypothetical rent De Anza could have charged during the time in question.

### Pre-judgment Interest

■ The issue is whether there is a statutory basis for awarding pre-judgment interest because without such there is no authority under Illinois law to award such interest. *U.C. Castings Co. v. Knight*, 754 F.2d 1363, 1376 (7th Cir.1985). Plaintiffs look to Ill.Rev.Stat., ch. 17, § 6402 as authority for pre-judgment interest here. This statute authorizes pre-judgment interest on "moneys ... due on any ... instrument in writing...." Plaintiffs claim that their leases are such "instruments" in writing. However, De Anza owes money to plaintiffs, not under but in spite of the express terms of an instrument in writing, only because a statute of the State of Illinois voided a provision of the lease. Thus plaintiffs' citation to *Montgomery Ward & Co., Inc. v. Wetzel*, 98 Ill.App.3d 243, 53 Ill.Dec. 366, 423 N.E.2d 1170 (1st Dist. 1981), is inapposite. In that case, a plaintiff was claiming money from a defendant under an express provision of a lease agreement, which was an instrument in writing.

Accordingly, plaintiffs' claim for pre-judgment interest is denied.

### 1987 Standard Form Lease

■ De Anza claims that in 1987, during the pendency of this suit, it offered plaintiffs a new lease that had been reviewed by plaintiffs' counsel. Apparently, certain of the plaintiffs entered into these new leases after voluntarily agreeing to the termination of their existing leases. There were certain changes in the proposed leases of a non-rental nature that could have economic value. In return, the new leases gave De Anza certain rights to raise rents that were more favorable than had previously existed. De Anza claims that these plaintiffs have waived any claim for damages occurring after these 1987 leases went into effect. Plaintiffs do not make a specific response to this claim.

The Act appears to provide no impediment to a tenant who wishes voluntarily to terminate his lease and enter into a new lease. Section 8, in fact, gives a tenant an unfettered right to terminate his lease for any reason at all (subject to a 30–day notice to the park owner). If a tenant voluntarily chose to terminate his lease, perhaps with

the thought of obtaining a better overall deal in exchange for higher rents, the Act appears to allow him to do so. The new lease then would be the lease referred to in Section 6 that the landlord must provide to the tenant. The key to the legality of this procedure would be the voluntary nature of the tenant's decision to terminate. Under the facts set forth above, where the tenant acted under advice of counsel while his suit was pending, voluntariness would be presumed. Accordingly, any tenant that fits the description in De Anza's brief is foreclosed from recovering damages for any period after January 1, 1988, the effective date of the new leases. Any other interpretation would deny a tenant a right to renegotiate his lease for what he considers more favorable terms.

Other Objections to the<br>Proposed Judgment

De Anza has made a number of specific objections to the form of the proposed judgment. Because plaintiffs have agreed with some of these objections, and this ruling has rendered others moot, the court is uncertain as to what disputes remain unresolved, if any. The parties are therefore ordered to consult with one another and try to present a judgment order which is agreed as to form and is consistent with this order.

IT IS SO ORDERED.